IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JAMES HEINLEIN and LORI HEINLEIN, his wife,  )
                                                  )
           Plaintiffs,                    )
  -vs-                                     )
                                          Civil Action No.  05-1769
                                        )
PROGRESSIVE NORTHERN INSURANCE      )
COMPANY,                                 )
                                        )
           Defendant.                  )

AMBROSE, Chief District Judge.

## OPINION and ORDER OF COURT

### SYNOPSIS

In this civil action, Plaintiffs claim bad faith in the Defendant insurance company's handling of an insurance claim, arising out of a motor vehicle accident occurring on July 20, 2001. The Complaint alleges violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Laws ("UTPCPL"), 73 Pa. C.S.A. § 201-1, et seq., Unfair Insurance Practices Act ("UIPA"),40 P.S. 1171.1, et seq., Unfair Claims Settlement Practices ("UCSP"), 31 Pa. Code § 146, et seq., and bad faith statute, 42 Pa. C.S.A. § 8371. Before the Court is Defendant's Motion for Summary Judgment on the bad faith claim.[1] Defendant now argues that, as a matter of law, it did not act in bad

---

[1]Defendant's Motion is limited to Plaintiffs' bad faith claim. Defendant's Reply Brief asserts Defendant's belief that it is not required to explicitly address the UTPCPL claim "when there is no evidence of any kind that Progressive ever engaged in [sic] type of fraudulent conduct required under that statute." Other than this statement, Defendant makes no legal or factual presentation regarding the UTPCPL claim. Defendant's belief is mistaken; I cannot rule on a question not placed before me, and it is Defendant's initial burden to demonstrate entitlement to judgment on a claim against it. I will not sua sponte assess the viability of Plaintiffs' UTPCPL claim.

faith, but instead reasonably evaluated Plaintiffs' claim.   For the following reasons, Defendant's Motion will be denied.

## I. FACTS

The following facts are undisputed, unless indicated otherwise.   By way of background, I include several facts immaterial to Defendant's Motion.

On July 20, 2001, husband-Plaintiff was operating his vehicle eastbound on McClaren Road, in Findlay Township, Pennsylvania, when he was struck by a vehicle operated by another driver traveling westbound.   Wife-Plaintiff was in the front passenger seat of the vehicle.   The other vehicle drifted across the road's center line, striking Plaintiffs' vehicle.   The other driver was insured by Allstate Insurance, and had a $15,000 policy limit.   Plaintiffs were insured by Defendant, and their policy contained a $10,000 medical bill limit, and a $5,000 wage loss limit.   They also had stacked underinsured motorist coverage through Defendant, with total policy limits of $1,200,000.

Husband-Plaintiff sustained serious leg injuries in the accident, such as multiple fractures of his right leg, damage to his right knee, and a fractured left heel.   The Plaintiffs' insurance agent reported the claim to Defendant on July 23, 2001, and Defendant immediately opened a claim file.   At the time, Plaintiffs were already represented by counsel.   Counsel advised Defendant that Plaintiffs would be pursuing a UIM claim as the result of the accident, and Defendant opened a UIM claim for them on July 24, 2001, with a $25,000 loss reserve.

On August 2, 2001, Defendant completed the accident investigation, and

concluded that the other driver was liable for the accident.   Throughout 2002, a series of communications occurred between Defendant's representative and Plaintiffs' counsel, primarily regarding the extent of husband-Plaintiff's injuries and wage loss.   Toward the end of 2002, Defendant had received various medical information from Plaintiffs' counsel and set its reserve to $600,000.   In late January of 2003, Defendant sent medical authorizations to husband-Plaintiff's medical providers, and reviewed medical records received in response over the succeeding months.  On or about October 8, 2003, Plaintiffs' counsel sent Defendant the report of a forensic accountant, which concluded that Plaintiffs had sustained economic losses in the amount of $1,013,910.  Defendant acknowledged receipt of the report, and requested certain financial records underlying the report.

On November 30, 2003, Plaintiffs submitted a settlement demand of policy limits.  Defendant determined that it needed to secure the financial records relied on by Plaintiffs' loss expert, and also that it needed to obtain an accounting expert to review the conclusions of Plaintiffs' expert, and also that it would need to obtain Examinations Under Oath ("EUO") from Plaintiffs.  By letter dated December 31, 2003, Plaintiffs' counsel provided additional records to Defendant.    In addition, on January 15, 2004, Defendant sent a copy of the claim file to outside counsel, to defend the claim under Defendant's supervision.

On February 10, 2004, Plaintiffs formally demanded arbitration.  By April 14, 2004, all of the arbitrators had been selected.   In the meantime, Defendant continued to seek additional medical and financial information from Plaintiffs, as

well as an IME of husband-Plaintiff, which was conducted on April 26, 2004.   On July 1, 2004, Defendant received a draft report of its own economic loss expert, which concluded that Plaintiffs had suffered an economic loss of $149,600.   The expert stated that he would need additional financial records before finalizing his report. His final report, dated August 12, 2004, opined as to the same figure.   The parties continued to engage in the gathering and exchange of information, including deposition of the IME doctor, Plaintiffs' submission of a report from a Certified Life Care Planner estimating future medical expenses at $555,112, and a revised report from Plaintiffs' economic loss expert.

On August 30, 2004, Defendant's claims attorney prepared a supplemental internal trial report.   She agreed with defense counsel's evaluation of husband-Plaintiff's pain and suffering in the range of $500,000 to $600,000, an economic loss claim in the range of $149,600 to $1,013,910, and future medical expenses in the range of $0 to $555,812.   She then recommended increasing the loss reserve to policy limits.

The arbitration commenced on September 2, 2004.   Defendant's claims attorney requested increased settlement authority up to $950,000, which request was granted on September 26, 2004.   Defendant's loss reserve was raised to policy limits on September 27, 2004. The second day of arbitration occurred on October 19, 2003.

Defendant then made its first settlement offer on November 2, 2004. Defendant offered $400,000 in a lump sum for pain and suffering, and $415,000 in

4

structured settlement for lost wages and future medical expenses.   Plaintiffs rejected the offer, and again requested policy limits.   On December 3, 2004, Defendant sent a letter offering to settle Plaintiffs' claim for $933,000.  Several days later, Plaintiffs' counsel advised Defendant that Plaintiffs were willing to settle the claim for $1,150,000.  Defendant did not reply to this demand, as it had concluded that its high evaluation of Plaintiffs' claim at $950,000 was accurate, and that the arbitrators should decide the claim.

The arbitration proceeded to a third day of hearings on December 15, 2004. The panel ultimately awarded $1,275,000 to husband-Plaintiff for pain and suffering and economic loss, and $225,000 to wife-Plaintiff for loss of consortium and economic loss. The verdict was then molded to match the policy limits.  Ultimately, Defendant paid Plaintiffs that amount, plus post-judgment interest.

## II. SUMMARY JUDGMENT STANDARDS

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).   In considering a motion for summary judgment, the Court must examine the facts in a light most favorable to the party opposing the motion.  International Raw Materials, Ltd. V. Stauffer Chem . Co., 898 F. 2d 946, 949 (3d Cir. 1990).   The moving party bears the burden of demonstrating the absence of any genuine issues of material fact.  United States v. Onmicare, Inc., 382 F. 3d 432 (3d Cir. 2004).  Rule 56, however, mandates the entry of

judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.  Celotex Corp. v. Cattrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 265 (1986).

In connection with a bad faith claim, the insured's evidence of bad faith must be "clear and convincing," which means that "the evidence is so clear, direct, weighty, and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 357 (3d Cir. 2004).  Bad faith, that is, may not merely be insinuated. Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 681, 688 (Pa. Super. 1984). Accordingly, the insured's burden in opposing summary judgment is "commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial." Northwestern Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005).

### III. BAD FAITH STANDARDS

The pertinent statute itself, 42 Pa. C.S.C. § 8371, does not define the term "bad faith."   Our Court of Appeals, however, has determined that the Pennsylvania Supreme Court would adopt the formulation set forth in Terletsky:

> 'Bad faith' on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith."

6

<u>Keefe v. Prudential Prop. and Cas. Ins. Co.</u>, 203 F.2d 218, 225 (3d Cir. 2000) (quoting <u>Terletsky</u>, 649 A.2d at 688).

Therefore, to recover under the bad faith statute, a plaintiff must demonstrate that the insurer did not have a reasonable basis for denying benefits under the policy; and that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim.  <u>Northwestern Mut. Life ins. Co. V. Babayan</u>, 430 F.3d 121, 137 (3d Cir. 2005).[2]

"Bad faith claims are fact specific and depend on the conduct of the insurer vis a vis the insured."  <u>Condio v. Erie Ins. Exchange</u>, 899 A.2d 1136, 1143 (Pa. Super. 2006).  For example, a failure to engage in settlement negotiations may constitute bad faith.  <u>See</u> <u>Frazier v. State Farm Auto. Ins. Co.</u>, 33 Pa. D. & C.4th 170, 176 (Phila. 1996). In addition, delay is certainly a relevant factor to consider when determining bad faith.    It is true, however, that "[a]ny reasonable delay caused by ... an investigation [of an insurance claim] does not give rise to a claim for bad faith." <u>Sanders v. State Farm</u>, 2000 Pa. D. & C. Dec. LEXIS 158 (Pa. C.P. Del. 2000).

These standards do not require an insurance company to submerge its own interests in favor of those of its insured, and investigating and litigating a claim does not constitute bad faith.  <u>See</u> <u>Pilosi</u>, 393 F.3d at 368.  Consistent with this concept,

---

[2]In <u>Klinger v. State Farm Mut. Auto. Ins. Co.</u>, 115 F.3d 230 (3d Cir. 1997), the Court predicted how the Pennsylvania Supreme Court would apply <u>Terletsky</u>, and refrained from adding a specific requirement of ill-will.  Instead, it applied the two-part test as stated therein.  <u>Klinger</u>, 115 F.3d at 233-34.  One of my colleagues recently analyzed Pennsylvania law post-<u>Klinger</u>, and concluded that ill-will is not a third element to be added to the <u>Terletsky</u> test, but is probative of the second element of that test.  <u>Employers Mut. Cas. Co. v. Loos</u>, 476 F. Supp. 2d 478, 491-92 (W.D. Pa. 2007).  I am persuaded by this formulation.

courts have recognized that a so-called "U" claim - that is, an underinsured or uninsured motorist claim - is "inherently and unavoidably adversarial." <u>Condio</u>, 899 A. 2d at 1144.

## IV. <u>DEFENDANT'S MOTION</u>

In the interest of clarity, I will define the parameters of this discussion from the outset.  Defendant's Motion paints with broad strokes, arguing generally that Plaintiffs cannot meet their burden of proof in this case.  The Motion focuses on the contention that an insurer is legally entitled to have its own evaluation of a contested "U" claim – that is, an uninsured or underinsured motorist claim -- so long as there is a reasonable basis for that evaluation; that premise, in turn, is urged as dispositive here.   Because there was a genuine disagreement over the value of husband-Plaintiff's claim, Defendant argues, its investigation could not have proceeded in bad faith.

In response to Defendant's Motion, Plaintiffs point to several specific instances of Defendant's alleged conduct: 1) failure to comply with communication requirements imposed by the UIPA and UCSP; 2) assignment of their claim to an inexperienced claims attorney; 3) failure to reconsider the value of the claim after Defendant's economic loss expert changed his opinion;  4) failure to recognize certain expenses that Plaintiffs would incur to replace husband-Plaintiff's services; 5) delay in making a settlement offer; and 6) failure to respond to Plaintiffs' counteroffer.

Several of these alleged instances, taken independently, might not amount

8

to bad faith as a matter of law under applicable standards.[3]   Plaintiffs, however, state that their allegations relate to bad faith conduct that "began after [Defendant] received [Plaintiffs'] settlement demand in December, 2003." I assume, therefore, that several of the specific instances listed above are presented as evidence of bad faith claims handling, rather than as independently actionable wrongdoing. Moreover, I am cognizant of Defendant's representation that its Motion does not require the Court to "re-try every detail" of the underlying claim. For these reasons, I will not parse Plaintiffs' claim and separately analyze each alleged incident of bad faith. Instead, I will deny the Motion, on broader grounds that genuine issues of material fact remain regarding the propriety of Defendant's conduct.

For example, genuine issues remain regarding the timing of Defendant's settlement offer, which appears to lie at the heart of Plaintiffs' claim.   The undisputed facts describe a thorough investigation of the value of Plaintiffs' claim, which, generally speaking, is certainly permissible.  Even if I were to agree with Defendant's proposition that it is legally entitled to have its own value of the claim, and that the record establishes a reasonable basis for its evaluation of the claim,

---

[3]For example, a failure to communicate in writing, in violation of the UIPA, is not necessarily bad faith.  See, e.g., Dinner v. United Services Auto. Ass'n Cas. Co., 29 Fed. Appx. 823, 827-28 (3d Cir. 2002); Employers Mut. Cas. Co. v. Loos, 476 F. Supp. 2d 478, 494 (W.D. Pa. 2007);  Williams v. Hartford Cas. Ins. Co., 83 F. Supp. 2d 567, 576 (E.D. Pa. 2000). Similarly, Plaintiffs suggest that Ms. Salsbury's losing track of her 2729 form was the mistake of an inexperienced employee, rather than a deliberate or reckless act.  Mere negligence does not rise to the level of bad faith.   Northwestern Mut. Life ins. Co. V. Babayan, 430 F.3d 121, 137 (3d Cir. 2005).   I do not now rule on the admissibility of evidence regarding each of these allegations, nor do I conclusively determine that they are not independently actionable.  I merely observe that the parties' submissions, along with my conclusion that at least one ground exists that requires that the present Motion be denied, are such that I need not address each instance separately.

those propositions would not be dispositive here.  A reasonable factfinder could conclude, despite those proffers, that Defendant acted in bad faith when it did not make any settlement offer until after the UIM arbitration commenced.

In other words, a jury could conclude given the information in Defendant's possession between the early liability determination and its initial offer to settle in November, 2004, the delay in proffering settlement was done in bad faith.  For example, in August of 2004, prior to the beginning of arbitration,  Defendant had already determined a total low value of Plaintiffs' claim totaling $649,600; several months later, after arbitration commenced, Defendant offered a settlement that would cost it $666,000.     Moreover, prior to August of 2004, Defendant had significant, if incomplete, information regarding Plaintiffs' damages.   Moreover, while Defendant defends its overall process of evaluating Plaintiffs' claim, it does not specifically or persuasively point to how the undisputed facts support the timing of its settlement decisions.[4]

Under the natural progression from Defendant's argument, a genuine dispute over the value of a UIM damages claim would, essentially, mean that no attempts at settlement need be made, and arbitration is always the appropriate result.    I am unwilling to endorse such a rule.  That Plaintiffs demanded full policy limits, or that the ultimate value of the claim was unclear or disputed, does not relieve Defendant

---

[4]The cases to which Defendant cites on this point relate to the amount, rather than the timeliness, of a settlement offer.   E.g., Kosierowski v. Allstate Ins. Co., 51 F. Supp. 2d 583 ( 1999); Quaciari  v. Allstate Ins. Co., 998 F. Supp. 578 (E.D. Pa. 1998).  In Quaciari, too, unlike here, liability itself was inconclusive.  Id. At 582-83.

of its obligation to engage in good faith negotiations with its insureds.  Cf., e.g., Frazier, 33 Pa. D & C. at 176-77.   It may be that Defendant, under all of the circumstances, acted reasonably in withholding a settlement offer until after the UIM arbitration commenced.  I must, however, view the facts in a light most favorable to the Plaintiffs.  Under those standards, a reasonable jury could conclude that there exists clear and convincing evidence of bad faith based on the facts surrounding the timing of settlement negotiations.  Therefore, those facts alone require that I deny summary judgment.

CONCLUSION

For the foregoing reasons, Defendant is not entitled to judgment as a matter of law on Plaintiffs' bad faith claim.  An appropriate Order follows.

* * * * * * * * * * * * * * * * * * * * * * * *

**ORDER**

AND NOW, this **17**th day of July, 2007, after careful consideration and for the reasons set forth above it is Ordered that Defendant's Motion for Summary Judgment (Docket No. [46]) is DENIED.

BY THE COURT:

/S/   Donetta W. Ambrose

Donetta W. Ambrose,
Chief U. S. District Judge

11